_____

MARC ZITTER,                          Civil No. 15-6488 (NLH/KMW)

       Plaintiff,

    v.                                    **OPINION**

CHRISTOPHER PETRUCCELLI, et
al.

       Defendants.

_____

**APPEARANCES:**

Jeffrey Erik Jakob, Esq.
William F. Cook, Esq.
William M. Tambussi, Esq.
Brown & Connery LLP
360 Haddon Avenue
Westmont, NJ 08108
    *Attorneys for Plaintiff*

Kevin J. Fleming, Esq.
State of New Jersey
Office of the Attorney General
25 Market Street
P.O. Box 116
Trenton, NJ 08625
    *Attorney for Defendants*

**HILLMAN, District Judge**

    Plaintiff Marc Zitter, an oyster farmer, brings this § 1983 suit alleging that various New Jersey state officials from the Department of Environmental Protection's Division of Fish and Wildlife ("DEP" or "F&W"), and the Department of Health ("DOH"), violated Zitter's constitutional rights when they charged him with

1

the petty disorderly persons offense of harvesting shellfish from prohibited waters, and confiscated and destroyed his oysters. The Court previously granted Defendants' Motion to Dismiss the First Amended Complaint but allowed Plaintiff leave to amend. *See Zitter v. Petruccelli,* 213 F. Supp. 3d 698 (D.N.J. 2016). Plaintiff timely filed a Second Amended Complaint, which Defendants presently move to dismiss, again, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

For the reasons stated below, the motion will be denied as moot in part and granted in part as to all claims asserted under federal law. The Court will decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c).

## I.

In the fall of 2012, Zitter started Cape May Oyster Company. (SAC ¶ 28) He purchased 300,000 seed oysters from the Haskin Shellfish Research Lab to "set up his own oyster aquacultural farm" where the oysters would grow. (SAC ¶ 29-30) As specifically stated in the Second Amended Complaint, "Haskin Lab is in Cape May Harbor, which is designated [by the DEP] as prohibited waters." (SAC ¶ 31 fn. 9) By operation of New Jersey statute and regulations, oysters cannot be "taken" from prohibited waters without a permit from the

DEP. *See* N.J.S.A. § 58:24-3[1]; N.J.A.C. § 7:12-1.2[2]; *see also* SAC ¶ 25-26. The Second Amended Complaint does not allege that Zitter had a DEP permit[3]; nonetheless, Zitter allegedly took the seed oysters from Haskin Lab and "deployed" them at the Atlantic Cape Fisheries' (ACF) farm site on the Delaware Bay. (SAC ¶ 30) The Second Amended Complaint specifically states that, at ACF, seed oysters are grown in "prohibited waters." (SAC ¶ 31 fn. 8)

"In April of 2013 Zitter moved his oyster seed from the ACF farm and divided them between two of his own aquacultural farm sites." (SAC ¶ 34)[4] One site-- the "Leased Waters" site-- was classified as "'approved' [by DEP] for the growing and harvesting of oysters." (SAC ¶ 37) The other site - the Dias Creek site - Zitter

---

[1] "The department shall prohibit the taking of oysters, clams or other shellfish from a place which has been condemned by the department pursuant to this act, and shall also prohibit the distribution, sale, offering for sale or having in possession of any such shellfish so taken, without a permit so to take, distribute, sell, offer to sell, or have in possession, first obtained from the department, under such rules and regulations as it shall adopt. A fee of $ 25.00 shall be charged for any permit so issued."

[2] "Condemned waters comprise the following classifications: Prohibited, Restricted, Conditionally Restricted, and Conditionally Approved when the water classification is in its closed status."

[3] The Second Amended Complaint alleges, "[t]he only permit required of Zitter at this time was a commercial shellfish license, which Zitter possessed." (SAC ¶ 33) Zitter alleges that, N.J.S.A. § 58:24-3 notwithstanding, "there was no permit which applied to the transport of oysters by shellfish farmers. As a result, . . . there was no permit for Zitter to request, and no permit for [DEP] to deny." (SAC ¶ 59)

[4] The Second Amended Complaint does not allege that Zitter had a DEP permit to take the oysters from the prohibited waters at ACF.

mistakenly believed "was also classified as 'approved,'" although within a month of moving his oysters to the site, he discovered that Dias Creek "was actually classified as 'prohibited.'" (SAC ¶ 37 and fn. 10)[5]

Zitter asserts that New Jersey law "permits the marketing and sale of oysters which originate in prohibited waters but are purified ('cultured')," thus, allegedly "in accordance with the same, Zitter started to move his [prohibited] Dias Creek oysters to the approved Leased Waters." (SAC ¶ 44)  Zitter moved oysters from Dias Creek to the Leased Waters beginning in "late May 2013" through "late June 2013" when he "halted transplanting the oysters" "on the advice of [] the Aquaculture Program Coordinator of Rutgers University." (SAC ¶¶ 39-40, 44, 52-53)[6]

"In late spring and early summer 2013," Zitter submitted a plan to DOH which "specifically provided that he would take his oysters from Dias Creek and move them to the Leased Waters before they would

---

[5]  The Second Amended Complaint does not specifically explain the two sites' relative location to each other.  It appears the sites were close, insofar as the Leased Waters are described as "the intertidal shoreline outside of Dias Creek. . . . The Leased Waters were **not** in Dias Creek." (SAC ¶ 35)(emphasis in SAC)
     This description is generally consistent with Defendant Petruccelli's Report of his surveillance of Zitter's operations which states the following: "The raft appeared to be used for housing shellfish suspended within the water column of the [Dias] creek.  In close proximity, I also observed and photographed a rack and bag oyster operation in 'Approved' waters on the south side of the mouth of Dias creek along the 'intertidal' shoreline of the Delaware Bayshore." (SAC Ex. C)

[6]  The Second Amended Complaint does not allege that Zitter had a DEP permit to take the oysters from the prohibited waters at Dias Creek.

be sold to the public." (SAC ¶ 70)  DOH allegedly approved Zitter's plan in July 2013. (SAC ¶ 72)

Over the summer of 2013, Zitter's oyster numbers increased substantially. (SAC ¶ 76)  Allegedly, "[i]n late August of 2013 [] Zitter began selling" only the Leased Water oysters that had never been in Dias Creek. (SAC ¶ 80)

In early September, DEP officials allegedly turned their attention to Zitter's operation. (SAC ¶ 84, 92-93)  According to Zitter, this timing was not coincidental.  Zitter asserts that "in early September of 2013" he was prepared to testify adversely to Defendant Petruccelli and the Division of Fish and Wildlife in a municipal court trial against two sea bass fishermen. (SAC ¶ 85-89)  The fishermen, however, "accepted a plea bargain" "on the third day of trial" and "Zitter was never called to the stand to testify." (SAC ¶ 91)

Over "several weeks" in September, DEP "conservation officers began taking video surveillance of" "Zitter's oyster-farming operations" at Dias Creek and the Leased Waters. (SAC ¶ 94)[7]

Then, on September 27, 2013, Fish and Wildlife Conservation Officer Defendant Petruccelli "issued to Zitter a Municipal Court Summons" charging Zitter with: "'NJSA 58:24-3 Harvested Shellfish from the [illegible] Dias Creek in violation of … NJAC 7:12-

---

[7]  Defendant Petruccelli's "Operations Report" is attached as Exhibit C to the Second Amended Complaint.  The report documents that F&W officials "observed" Zitter's operations on August 26, 2013, and September 4, 12, 13, 17, 18, 19 and 27, 2013. (SAC Ex. C)

21(a)(19)(iii).'" (SAC ¶ 126 and Ex. B)  On that same day, "F&W conservation officers raided Zitter's processing facility," "shut down his oyster-farming operation," and "Defendant Petruccelli confiscated Zitter's harvester's tags and dealer's logs." (SAC ¶ 121, 132)

The next day, September 28, 2013, "F&W Officers, including Defendant Petruccelli, entered three local restaurants that bought oysters from Zitter" and "seized dealer's tags belonging to Zitter that were on his previous shipments." (SAC ¶ 137)

The following day, September 29, 2013, Zitter met with Defendants Petruccelli and Tomlin to explain to them that he allegedly had not "marketed or sold" any oysters "originating in Dias Creek" and that the Dias Creek oysters which had been moved to the Leased Waters "were still in the 6-month purification process," all of which Zitter allegedly explained was in compliance with New Jersey law. (SAC ¶ 137-38)

"[O]n September 30, 2013, Defendant Petruccelli advised Zitter that he had spoken with [Petruccelli's] superiors and that [Petruccelli] was directing Zitter not to harvest or to tend his oyster farm in any manner, and that if he did so he would face criminal charges." (SAC ¶ 144)

Also on September 30, "Defendants Petruccelli and NJDOH inspector Danielle Bytheway [allegedly] entered Zitter's processing facility at Menz Restaurant without any warrant, authorization, or permission," and confiscated Zitter's log book. (SAC ¶ 151-52)

On October 2, 2013, officials from the DOH, including

Defendants Tomlin and Bytheway, acting on a "complaint" from F&W,

inspected Zitter's processing facility. (SAC ¶ 154-55)  The

inspection report, attached as Exhibit D to the Second Amended

Complaint, documented at least 13 "key violations"[8] and one "critical

violation."  Concerning the critical violation, the report states,

> On September 27th 2013, The New Jersey Department of
> Environmental Protection Fish and Wildlife seized and
> sealed oysters located in the refrigeration unit due to
> a pending investigation with oysters being harvested
> from prohibited water, and comingling oysters from Dias
> Creek with an approved lot.  The oysters were embargoed
> on 10/1/13 by the New Jersey Department of Health Seafood
> and Shellfish Project due to sourcing and concern of
> comingled prohibited oysters.  The oysters were counted
> to be 1,234 ct.  No harvest tags were present on oysters
> or in firm's records. NJDOH Seafood and Shellfish
> Project issues a release of embargo to release custody
> of oysters to NJDEP Fish and Wildlife Conservation
> Officers. (CRITICAL VIOLATION)

(SAC Ex. D, p. 3)  Notably, the inspection report also documented

other "deficiencies with harvest records" in addition to the 1,234

oysters without tags. (Id.)

According to the Second Amended Complaint, "the F&W defendants

used the NJDOH to gain access to Zitter's facilities for the purpose

of fabricating health violations against him, in order to falsely

---

[8]  Fifteen key violations are noted in the report, but two appear to
be violations by Betsy Haskin, who shared the processing facility
space with Zitter and his company but has no other connection to
Zitter's operations or company. (SAC Ex. D, p. 4, and ¶ 158)  It is
not clear whether the Defendants were aware of the relationship, or
lack thereof, between Zitter and Haskin when the inspection took
place.  Indeed, Haskin allegedly signed a voluntary discontinue form
for Zitter's operations during the inspection, even though Zitter
was not present at the inspection. (SAC ¶ 154, 160)

accuse him of criminal conduct and purport to justify seizing his equipment, shutting down his business, and confiscating and disposing of more than 600,000 of his oysters, all without any court hearing." (SAC ¶ 157)

On October 8, 2013, Defendant Pettrucelli appeared before a New Jersey Superior Court Judge and obtained a search warrant for the pontoon boat which Zitter used to grow his oysters in Dias Creek. (SAC Ex. G). The warrant states that "The property being sought, and the conditions to be documented, will produce evidence of the crimes of: Unlawful Harvest of Shellfish, N.J.S.A. 58:24-1 et seq." The warrant further states: "THE EVIDENCE TO BE SEIZED IS AS FOLLOWS: FLOATING PONTOON BOAT; WOODEN RAFT, MERCURY OUTBOARD MOTOR, ASSOCIATED EQUIPMENT, DOCUMENTS AND SHELLFISH USED FOR SHELLFISH AQUACULTURE ACTIVITIES OCCURRING ON THE BARGE INCLUDING, BUT NOT LIMITED TO: GENERATORS, PUMPS, HOISTS, SHELLFISH GROWING AND/OR STORAGE CONTAINERS, LEDGER BOOKS, LEDGER BOARDS, NOTEBOOKS AND OYSTERS." (SAC Ex. G; Caps in original)

The next day, Defendants Petruccelli and Tomlin executed this warrant and seized "one white dry erase board; four colored 3" vinyl tags; [and] five receipts for vinyl tags." (SAC Ex. G, "Return of Search Warrant" and "Receipt and Inventory of Items Seized")

Similarly, three days later, on October 11, 2013, Defendant Petruccelli again appeared before the same Superior Court Judge and obtained a second search warrant for the same Dias Creek location and the Leased Waters. Like the first warrant, the second warrant

states that the property being sought will produce evidence of "Unlawful Harvest of Shellfish." (SAC Ex. H)  Over October 15, 16 and 17, 2013, Defendant Petruccelli, with the assistance of Defendants Fresco, Snellbaker, Tomlin, Harp, Nicklow, and Hausaman, seized "Approximately 370,000 Oysters; 310 Mesh Bags Used to Contain Oysters; [and] 769 Plastic Trays Used to Contain Oysters." (SAC Ex. H, "Return of Search Warrant" and "Receipt and Inventory of Items Seized")[9]

At 1:32 pm on October 17, 2013, Defendant Chicketano sent an email stating, "[t]he warrant has been served on Mr. Zitter's oyster barge and 'lease.'  All oysters have been removed and deposited back into Delaware Bay." (SAC ¶ 189)  Zitter alleges that "[a]fter seizing Zitter's oysters, Defendants Petruccelli, Tomlin, Snellbaker, Hausamann, Harp, and Nicklow packed them into bushel baskets, then onto the back of pickup trucks, then onto the DEP vessel the James Joseph, where they steamed to the mouth of the Maurice River, which waters were designated as 'prohibited' for harvesting oysters, where they dumped all of Zitter's oysters." (SAC ¶ 177)

On October 24, 2013, Defendant Petruccelli issued two municipal court summonses to Zitter.  Both summonses charge "violation of

---

[9]  The Second Amended Complaint does not explain the apparent discrepancy between the warrant's receipt and inventory stating that approximately 370,000 oysters were seized, and the Second Amended Complaint's allegation that "[o]ver the course of several days beginning on October 15, 2013 the Defendant F&W Officers illegally seized approximately 640,000 oysters from Marc Zitter." (SAC ¶ 176)

N.J.S.A. 58:24-1 et seq." (SAC Ex. J, K), and state that Zitter "did commit . . . N.J.S.A. 58:24-10 confiscation and forfeiture of 370,000 oysters" (SAC Ex. J), and "one dry erase board; four vinyl tags; five vinyl tag receipts" (SAC Ex. K)

Trial was scheduled to take place in Middle Township Municipal Court of Cape May County. (SAC ¶ 240)  However, the DEP eventually withdrew the complaints, and the case was dismissed. (SAC ¶ 246)

Zitter alleges that he was singled-out for adverse treatment by Defendants insofar as other allegedly similar oyster operations were allegedly allowed to "continue without interference." (SAC ¶ 190) Specifically, Zitter alleges that DEP knew that Richard Cash "was growing oysters" in Dias Creek (SAC ¶ 191, 193) but "Cash was never prosecuted or cited by F&W or anyone else with respect to his Dias Creek oysters." (SAC ¶ 204)

Zitter also alleges that DEP knew that ACF was "engaging in oyster operations . . . involving prohibited waters," (SAC ¶ 209) but "ACF was never prosecuted or cited by F&W or anyone else with respect to their oysters." (SAC ¶ 212)

The Second Amended Complaint asserts 11 counts against all Defendants: (1) § 1983 unconstitutional seizure of Zitter's equipment, harvester's tags, log book, and oysters in violation of the Fourth and Fourteenth Amendments; (2) § 1983 unconstitutional taking of Zitter's equipment, harvester's tags, log book, and oysters in violation of the Fifth and Fourteenth Amendments; (3) § 1983 "equal protection / selective enforcement" in violation of the

Fifth and Fourteenth Amendments; (4) § 1983 "equal protection /
class of one" in violation of the Fifth and Fourteenth Amendments;
(5) § 1983 retaliation in violation of the First Amendment; (6) §
1983 malicious prosecution; (7) "violation of Plaintiff's rights
under the New Jersey Constitution"; (8) "violation of Plaintiff's
rights under New Jersey's Civil Rights Act, N.J.S.A. 10:6-2(c)"; (9)
common law malicious prosecution; (10) "civil conspiracy"; and (11)
"violations of New Jersey's Tort Claims Act, N.J.S.A. 59:1-1 et
seq."

## II.

The Court incorporates herein by reference the legal standards
set forth in the Court's opinion addressing Defendants' Motion to
Dismiss the First Amended Complaint in this case. *See Zitter v.
Petruccelli*, 213 F. Supp. 3d 698, 704-05 (D.N.J. 2016).

## III.

## A.    Fourth Amendment-- seizure of Zitter's personal property

"A Fourth Amendment 'seizure' of personal property occurs when
'there is some meaningful interference with an individual's
possessory interests in that property.' Destroying property
meaningfully interferes with an individual's possessory interest in
that property.  The destruction of property by state officials poses
as much of a threat, if not more, to people's right to be 'secure .
. . in their effects' as does the physical taking of them." *Brown v.
Muhlenberg Twp.*, 269 F.3d 205, 209-10 (3d Cir. 2001)(internal
citations and quotations omitted); *see also Soldal v. Cook County*,

11

506 U.S. 56, 61-62 (1992)(holding that the seizure and "literal[] .
. . carr[ying] away" of the plaintiffs' property implicated
plaintiffs' Fourth Amendment rights, and whether those rights were
violated "requires determining if the seizure is reasonable.").

The Second Amended Complaint pleads that the Defendants seized
"one white dry erase board; four colored 3" vinyl tags; [and] five
receipts for vinyl tags", and "[a]pproximately 370,000 Oysters; 310
Mesh Bags Used to Contain Oysters; [and] 769 Plastic Trays Used to
Contain Oysters." (SAC Ex. G, H).

However, all of these items allegedly were seized pursuant to
warrants.  "In the ordinary case, the Supreme Court has viewed a
seizure of personal property as per se unreasonable within the
meaning of the Fourth Amendment unless it is accomplished pursuant
to a judicial warrant issued upon probable cause and particularly
describing the items to be seized." *Brown*, 269 F.3d at 210.

The parties dispute whether the Second Amended Complaint
alleges facts plausibly supporting a conclusion that Defendants
lacked probable cause to believe that Zitter violated N.J.S.A. §
58:24-3, which states in relevant part, "the [DEP] shall prohibit
the taking of oysters, clams or other shellfish from a place that
has been condemned by the department pursuant to this act, and shall
also prohibit the . . . having in possession of any such shellfish
so taken without a permit so to take . . . or have in possession,
first obtained from the department, under such rules and regulations
as it shall adopt."

Zitter repeatedly alleges that he never *marketed* or *sold* any oysters from prohibited waters, and therefore, he argues, there was no probable cause to believe that he violated N.J.S.A. § 58:24-3. (SAC ¶ 47, 48, 65, 129; Opposition Brief, p. 17)  The flaw in this argument, as Defendants correctly observe, is that Zitter was charged with *harvesting*-- i.e., "taking"-- the oysters out of Dias Creek, which the Second Amended Complaint alleges: (1) Zitter did (SAC ¶¶ 39-40, 44, 52-53); (2) Defendants observed him doing (SAC Ex. C)(reporting that officers observed Marc Zitter's employees "lifting racks of oysters out of [Dias Creek] and spraying them with water" on September 4, 12, 13, and 17, 2013); and (3) Zitter apparently admitted to doing. (SAC Ex. C)("I asked Zitter if he had removed any oysters from the raft in Dias Creek for any other purpose and he said, 'I've moved some to the flats, yes.'").

Moreover, it may be plausibly inferred that Defendants had every reason to believe that Zitter lacked the requisite permit because it is undisputed that, during the relevant time period, DEP had not established a process by which to obtain such a permit. (SAC ¶ 59)[10]

Thus, the Second Amended Complaint fails to plausibly plead that Defendants lacked probable cause to believe Zitter had violated N.J.S.A. § 58:24-3.

---

[10]  Contrary to Plaintiff's argument, the alleged lack of any process by which to obtain a permit does not plausibly support an inference that the conduct is lawful.

This is not the end of the analysis, however, insofar as Zitter argues that the destruction of his oysters went beyond the scope of the warrant's authorization. (*See* SAC ¶ 275, "Nothing in any of the search warrants . . . authorized the destruction of any oysters.")

The October 11, 2013 warrant (SAC Ex. H), pursuant to which Defendants seized the oysters, on its face, only authorizes "any law enforcement officer" to:

> enter and search . . . the premises described . . . for the property specified . . . and to *take into your possession* and document all such specified property . . . which may be found in or on the said premises *to the end that the same may be dealt with according to law;*

and to:

> *retain any physical evidence* that you deem unrelated to the investigation being conducted, if said evidence is deemed prima facie evidence of any crime being committed within the State of New Jersey, *so that same can be properly dealt with according to law.*

(SAC Ex. H)(emphasis added).

The warrant plainly does not authorize the disposal or destruction of the oysters. Therefore, with respect to the oysters only (i.e., not the equipment and other personal property seized), the remaining issue is whether Defendants "meaningful[ly] interfere[d] with [Zitter's] possessory interests in" the oysters. *Brown*, 269 F.3d at 209. Zitter admits that he took the oysters out of the prohibited waters of Haskins Lab, and then out of the prohibited waters of ACF, and then out of the prohibited waters of Dias Creek, at all times without a permit. Thus, the question becomes: Does a person have a protectable Fourth Amendment

14

possessory interest in property obtained in violation of law?

    *Rizzo v. Connell*, 2012 U.S. Dist. LEXIS 1288 (D.N.J. 2012),
suggests the answer is no.  Under factual circumstances that are
remarkably similar, *Rizzo* held that a shellfish farmer (of clams
rather than oysters) had "never properly obtained an actionable
property interest in [shellfish harvested in violation of N.J.S.A.
58:24-3]," reasoning that "property acquired by a criminal act never
resides in the criminal and . . . the same is true when property is
procured through fraud." *Rizzo*, 2012 U.S. Dist. LEXIS at *23-24.
Admittedly, *Rizzo* addresses a 14th Amendment procedural due process
claim, not a 4th Amendment seizure of property claim, but the Court
finds no persuasive reason why the same reasoning should not apply.
*See United States v. Troiano*, 365 F.2d 416, 418 (3d Cir. 1966) ("the
car in this case and the counterfeit stamps in it were not property
the ownership or possession of which the [Fourth Amendment]
protects.  Quite to the contrary, both the stamps and the car
containing them were contraband, subject as such to seizure without
warrant and over the possessor's objection.")(citing *Brinegar v.
United States*, 338 U.S. 160 (1949)).

    Thus, the Court holds that Zitter had no valid possessory
interest in the oysters[11], and therefore the alleged destruction of

--------------------------------------------------

[11]  Zitter's allegation that the Leased Waters were approved does not
support a holding that as to those oysters, Zitter has stated a
claim.  Even the Leased Waters oysters were originally obtained by
Zitter from prohibited waters, i.e., in violation of law.

the oysters does not violate the Fourth Amendment.

Alternatively, Defendants are entitled to qualified immunity to this claim. "It would [not] be clear to a reasonable officer . . . in the situation he confronted" *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), that Zitter had a valid possessory interest in the oysters that were taken from prohibited waters.

Defendants' Motion to Dismiss Count One will be granted.

## B.    Procedural due process

To the extent that Count One also asserts a procedural due process claim based on the seizure of Zitter's personal property and the disposal / destruction of the oysters,[12] Defendants' Motion to Dismiss will be granted.

"To analyze a claim for procedural due process, a court must first determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment.  If the court determines that the interest

---

[12]   The Second Amended Complaint does not contain a stand-alone count asserting violation of procedural due process.  However, Count One, entitled, "Violation of Plaintiff's Federal Civil Rights under the Fourth and Fourteenth Amendments to the United States Constitution," alleges, "Defendants' seizure of Plaintiff's property and their destruction of his oysters violated Plaintiff Zitter's rights to be free of unreasonable searches and seizures under the Fourth Amendment and procedural and substantive due process under the Fourteenth Amendment to the United States Constitution." (SAC ¶ 279)
    In his opposition brief, Zitter states that he "withdraws" his substantive due process claim "without prejudice subject to further discovery in this action." (Opposition Brief, p. 38 n.31)  The Court construes this as a Notice of Voluntary Dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).  Accordingly, the substantive due process claim will be dismissed without prejudice, and Defendants' Motion to Dismiss this claim will be denied as moot.

16

asserted is protected by the Due Process Clause, the question then
becomes what process is due to protect it." *Montanez v. Sec'y Pa.
Dep't of Corr.*, 773 F.3d 472, 482 (3d Cir. 2014)(internal citations
and quotations omitted).

As discussed above, shellfish farmers have no 14th Amendment
procedural due process property interest in shellfish harvested in
violation of N.J.S.A. 58:24-3. *Rizzo v. Connell, Jr.*, 2012 U.S.
Dist. LEXIS 1288 (D.N.J. 2012).

Alternatively, Defendants are entitled to qualified immunity.
"It would [not] be clear to a reasonable officer . . . in the
situation he confronted" *Saucier*, 533 U.S. at 201-02, that Zitter
had a valid property interest in the oysters that were taken from
prohibited waters.

As to Zitter's other personal property - in which the Court
assumes without deciding Zitter had a legitimate property interest -
it was seized pursuant to a warrant supported by probable cause.
The post-deprivation process available to recover property seized by
state authorities is all the process that is due. *See Revell v. Port
Auth.,* 598 F.3d 128, 139 (3d Cir. 2010)("'We have recognized that a
civil cause of action for wrongful conversion of personal property
under state law is a sufficient post[-]deprivation remedy when it
extends to unauthorized seizures of personal property by state
officers.'")(quoting *Case v. Eslinger,* 555 F.3d 1317, 1331 (11th
Cir. 2009)), *cert. denied by* 562 U.S. 1178 (2011); *cf. City of W.
Covina v. Perkins,* 525 U.S. 234, 241 (1999) ("Once the property

17

owner is informed that his property has been seized, he can turn to
[] public sources to learn about the remedial procedures available
to him.  The City need not take other steps to inform him of his
options.").  While Zitter argues that the post-deprivation remedies
under state law were inadequate, he makes this argument only as to
the oysters, not his other personal property.

Defendants' Motion to Dismiss the Procedural Due Process claim
will be granted.

**C.   Fifth Amendment-- taking of Zitter's personal property**

The Court previously dismissed with prejudice Zitter's takings
claim, *Zitter*, 213 F. Supp. 3d at 708-09, and then subsequently
denied as time-barred Zitter's motion for reconsideration of that
decision. *Zitter v. Petruccelli*, 2017 U.S. Dist. LEXIS 69692 (D.N.J.
May 8, 2017).  However, to the extent Zitter may assert a new theory
of his takings claim that the Court has not previously decided, the
Court addresses it now, and holds that the claim must be dismissed.

The Third Circuit has stated on more than one occasion that,
"there can be no cognizable Fifth Amendment 'takings' claim when
property is seized pursuant to a lawful search warrant.  Property
seized pursuant to the criminal laws is not a 'taking' justifying
compensation." *McKenna v. Portman*, 538 F. App'x 221, 224 (3d Cir.
Oct. 8, 2013); *see also Hart v. Gordon,* 591 Fed. App'x 125, 129 (3d
Cir. 2014)("no viable Takings Clause claim occurs when property has
been seized pursuant to a lawful search warrant.").

Thus, to the extent Zitter's claim is based on the seizure of

the oysters and Zitter's personal property, it fails to state a claim.

To the extent Zitter's claim is based on the destruction of the oysters allegedly in excess of the warrant's authorization, it fails for reasons similar to those stated above.

Having held that Zitter had no legally protectable possessory interest for Fourth Amendment purposes, and no legally protectable property interest for Fourteenth Amendment procedural due process purposes, it follows that Zitter also had no legally protectable property interest for Fifth Amendment takings clause purposes. The Court holds that Zitter fails to state a claim under the takings clause because the facts he alleges support the conclusion that he lacked a property interest in the oysters that were destroyed.

Alternatively, Defendants are entitled to qualified immunity. *McKenna* may suggest that subsequent destruction of evidence seized pursuant to a valid warrant *cannot* support a takings claim. *McKenna* cites many decisions from other Courts of Appeal for the proposition that the "Takings Clause does not apply when property is retained or damaged as the result of the government's exercise of police power." 538 Fed. App'x at 224.

The Court holds that the law concerning the takings clause as applied to illegally obtained personal property[13] seized pursuant to

---

[13] It should also be noted that it was not until 2015 that the Supreme Court held that the takings clause applied at all to personal property as distinguished from real property. *See Horne v. Dept. of Agriculture*, 576 U.S. ___ (2015).

a valid warrant, and then destroyed allegedly beyond the authorization of the warrant was not clearly established when the oysters were allegedly destroyed. "It would [not] be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201-02.

Count 2 of the Second Amended Complaint will be dismissed with prejudice.

**D.    Equal Protection -- selective enforcement**

In the Court's previous opinion dismissing this claim without prejudice, the Court explained why Zitter's allegations were insufficient as a matter of law:

> In his complaint, Plaintiff alleges that one other oyster farmer was growing oysters a few hundred feet away from his operations and 'was never cited, charged, or prosecuted by the NJDEP or NJDOH, nor were his oysters seized by any Conservation Officers from [Fish and Wildlife] or his business shut down by them.' (Am. Compl. ¶¶ 23-25.) Plaintiff, however, fails to allege sufficient facts showing how this neighboring farmer was similarly situated. For example, did this other farmer have a permit, did this farmer grow the same amount of livestock, and did this farmer sell livestock directly from Dias Creek? Further, Plaintiff does not allege he was treated differently from 'others' but from one other farmer. This is insufficient to establish Plaintiff was 'singled out.' *Engquist*, 553 U.S. at 601. Accordingly, Plaintiff's equal protection claims will be dismissed without prejudice.

*Zitter*, 213 F. Supp. 3d at 710.

Zitter's Second Amended Complaint does allege additional facts fleshing-out his selective enforcement claim. The question is whether the amendments cure the defects identified in the previous opinion. The Court holds no.

Zitter specifically identifies two farmers whom he alleges are similarly situated: Richard Cash and ACF. (SAC ¶¶ 190-219) As to ACF, the Second Amended Complaint does not allege facts plausibly supporting a conclusion that ACF is similarly situated with Zitter. First, the Second Amended Complaint explains that "ACF is one of the largest oyster operations in New Jersey which grows, harvests, and sells millions of oysters each year." (SAC ¶ 30 n. 8) Zitter's operation, as alleged, was not nearly that large.

Second, the Second Amended Complaint alleges that ACF only grew oysters in prohibited waters, which other "oyster purchasers" "would subsequently [move]" to approved waters for purification. (SAC ¶ 211) Critically, the Second Amended Complaint does not allege that ACF itself ever moved its oysters from prohibited waters. Thus, the Court holds that the Second Amended Complaint fails to establish that ACF is similarly situated.

Having ruled-out ACF as a legally adequate comparator, Zitter's selective enforcement claim is once again based on the treatment of one other farmer, which the Court has already ruled is legally insufficient.

Additionally, the allegations concerning Cash are too vague to support Zitter's selective enforcement claim. With respect to Cash's actions in moving or selling his oysters (not simply growing his oysters, or operating his oyster farm) the Second Amended Complaint, in a mere two sentences, alleges that "[l]ike Zitter, Cash was moving oysters from Dias Creek to the approved waters along

21

the intertidal shoreline at the same time as Zitter," and "Cash has harvested, marketed, and sold oysters which were once in Dias Creek." (SAC ¶¶ 203, 208) Like the previous complaint, the Second Amended Complaint leaves too many important questions unanswered. For example, how large were Cash's oysters? How many were allegedly moved, harvested, marketed or sold? To whom did Cash allegedly sell oysters, and for what purpose?

The Court holds that the Second Amended Complaint fails to allege sufficient facts supporting a plausible conclusion that Zitter was treated differently from similarly situated oyster farmers. Accordingly, Count 3 of the Second Amended Complaint will be dismissed with prejudice.

**E. Equal Protection-- "class of one"**

As explained in the Court's previous decision, the failure to allege similarly situated comparators is fatal to Zitter's class of one equal protection claim as well. *Zitter*, 213 F. Supp. 3d at 710.

Zitter argues that "the SAC . . . states, with sufficiency and particularity, a viable equal protection claim under *Willowbrook* [*v. Olech*, 528 U.S. 562 (2000)]." (Opposition Brief, p. 33) The Court disagrees.

*Willowbrook* held that a class of one claim may be premised on allegations of irrational and arbitrary government actions without an allegation that the plaintiff is a member in a protected class or group. 528 U.S. at 564-65. The Court did not, however, excuse a class of one plaintiff from pleading that he was treated differently

than those similarly situated.  To the contrary, *Willowbrook* specifically states, "[o]ur cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564; *see also Startzell v. City of Philadelphia,* 533 F.3d 183, 203 (3d Cir. 2008)("An essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were similarly situated. Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects.")(internal citations and quotations omitted).

Count 4 of the Second Amended Complaint will be dismissed with prejudice.

## F.    First Amendment-- retaliation

In the Court's previous opinion, the Court held that the complaint failed to allege that Zitter actually engaged in protected activity because he allegedly only offered to testify against the DEP but was "never called to testify and never testified." *Zitter*, 213 F. Supp. 3d at 709.  Nonetheless, stating that "it is conceivable that Plaintiff may be able to assert facts showing he engaged in speech," the Court dismissed the First Amendment retaliation claim without prejudice. *Id.*

Defendants presently move to dismiss, arguing that this identified defect still remains in the Second Amended Complaint.

Zitter, in his opposition brief, states, "Plaintiff withdraws his First Amendment retaliation claim without prejudice subject to further discovery in this action." (Opposition Brief, p. 38 n. 31)

The Court will construe this statement as a Notice of Voluntary Dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). Accordingly, Count 5 will be dismissed without prejudice and Defendants' Motion to Dismiss Count 5 will be denied as moot.

## G. § 1983 malicious prosecution

As set forth above, the Second Amended Complaint does not plausibly allege that Defendants lacked probable cause to believe that Zitter violated N.J.S.A. § 58:24-3. This deficiency is fatal to Zitter's federal malicious prosecution claim. *Zitter*, 213 F. Supp. 3d at 706.

Defendants' Motion to Dismiss Count 6 of the Second Amended Complaint will be granted.

## H. Claims against Defendants Martin and Fresco

Defendant Robert Thomas Martin is alleged to be the Commissioner of the DEP during the relevant time period. Defendant Dominic Fresco is alleged to be a "Conservation Officer at F&W" during the relevant time period. Defendants assert the claims against these two Defendants should be dismissed because the claims are based solely on a theory of respondeat superior rather than any factual allegations of personal involvement in the transactions or occurrences that are the basis of this suit.

Zitter responds that he has alleged sufficient facts plausibly

supporting the supervisory liability of these two Defendants.

Zitter cites to four paragraphs of the Second Amended Complaint

which he says plausibly plead "that Defendants Martin and Fresco had

knowledge of the Defendants' actions against [Zitter], and that they

directed and/or authorized those acts." (Opposition Brief, p. 36)

Those four paragraphs state:

273.    Defendants seized Plaintiff's property under the
express direction, authority and/or supervision of
Defendants Fresco, Chicketano, Chanda, Martin,
Alexander, of F&W, NJDEP and/or NJDOH, respectively,
which Defendants are jointly and severally liable for
the actions of the Defendants who seized Plaintiff
Zitter's property and destroyed his oysters.

293.    Defendants seized Plaintiff's property and shut
down his business under the express direction, authority
and/or supervision of Defendants Chanda, Martin, and
Alexander, which Defendants are jointly and severally
liable for the actions of the Defendants who seized
Plaintiff Zitter's property and destroyed his oysters.

326.    Defendants seized Plaintiff's property and shut
down his business under the express direction, authority
and/or supervision of Defendants Fresco, Chicketano,
Chanda, Martin, and Alexander, which Defendants are
jointly and severally liable for the actions of the
Defendants who seized Plaintiff Zitter's property and
destroyed his oysters.

337.    Defendants seized Plaintiff's property and shut
down his business under the express direction, authority
and/or supervision of Defendants Fresco, Chicketano,
Chanda, Martin, and Alexander, which Defendants are
jointly and severally liable for the actions of the
Defendants who seized Plaintiff Zitter's property and
destroyed his oysters.

These allegations are conclusory and insufficient as a matter

of law. *See Phillips v. Northampton Co., P.A.,* 2017 U.S. App. LEXIS

7345 at *4 (3d Cir. 2017) ("To plead that [defendant] was liable in

her individual capacity as a supervisor, [plaintiff] had to allege that [defendant] was personally involved in the constitutional violation-- vicarious liability is not enough.  [Plaintiff] did not plead facts sufficient to allege that [defendant] established a policy, practice, or custom that directly caused the harms that Phillips allegedly endured.  Nor did [plaintiff] plead facts sufficient to allege that [defendant] participated in, directed, or had knowledge of (and acquiesced to) any of the constitutional violations that [plaintiff] alleged.").

Alternatively, the supervisory liability claims fail because Zitter has failed to allege an actionable underlying constitutional deprivation. *Stewart v. Pa. Dep't of Corr.*, 2017 U.S. App. LEXIS 1703 at *7 n.3 (3d Cir. 2017)("supervisory liability under § 1983 may exist only when there is an underlying constitutional violation.").

Defendants' Motion to Dismiss all § 1983 claims against Defendants Martin and Fresco will be granted.

I.    **Remaining state law claims**

The Court declines to exercise supplemental jurisdiction over the remaining state law claims. *See Zitter,* 213 F. Supp. 3d at 705.

**IV.**

For the reasons stated above, the Motion to Dismiss will be denied as moot in part as to the First Amendment retaliation claim and the Fourteenth Amendment substantive due process claim, and granted in part as to all other claims asserted under federal law.

The Court will decline to exercise supplemental jurisdiction over the remaining state law claims.  An appropriate Order accompanies this Opinion.



Dated: August 7, 2017                    ___s/ Noel L. Hillman___
                                         Noel L. Hillman, U.S.D.J.